IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DEE DEIDRE FARMER                          *

                    v.                     *     CIVIL ACTION NO. CCB-02-3216

JACK KAVANAGH[1]                           *
BERNARD FORD
JOSEPH P. SACCHET                          *
KAREN A. LEISINGER[2]
ROBERT MILLER                              *
PATRICIA ALLEN
SEWALL B. SMITH                            *
MARIA FISHER
                                           *
                                         ***

### MEMORANDUM

This suit by a Maryland Division of Correction ("DOC") inmate, Dee Deidre Farmer[3]

("plaintiff" or "Ms. Farmer"), alleges that her rights under the United States and Maryland

Constitutions were violated when she was transferred to and confined in the Maryland

Correctional Adjustment Center ("MCAC"), a type of facility referred to as a "Supermax". The

defendants– a former deputy commissioner (Mr. Kavanagh), a former captain (Mr. Ford),[4] a

former warden (Mr. Sacchet), a current deputy commissioner (Ms. Allen), a current warden (Mr.

---

[1]     Although Jack Kavanagh has been referred to as Jack Kavanaugh at other points in this
        litigation, the court will adhere to the former spelling, since the defendants use it in their
        motion to dismiss or for summary judgment, and it is also consistent with the docket.

[2]     Karen Elliott is now known as Karen Leisinger.  The docket shall be amended to reflect
        her correct name.

[3]     The plaintiff is a  male-to-female transsexual, and has also been known as Douglas
        Farmer.  *Farmer v. Brennan*, 511 U.S. 825, 829 (1994); *Farmer v. Circuit Court of
        Maryland for Baltimore County*, 31 F.3d 219, 220 (4th Cir. 1994).

[4]     Mr. Ford was never served with process.  (*See* Pl.'s Opp'n Defs.' Mot. Dismiss or Summ.
        J. [hereinafter "Pl.'s Opp'n] at 3, n.5.)  As the plaintiff herself acknowledges this, the
        court will assume she does not wish to pursue her claims against Mr. Ford (counts I and
        II), and he will be dismissed from the case.

Smith), and three case managers (Ms. Leisinger, Ms. Fisher, and Mr. Miller), all of whom work

or did work for the DOC– have moved for dismissal of or summary judgment on all counts.  The

motion has been fully briefed and, pursuant to Local Rule 105.6, no hearing is necessary.  For the

reasons stated below, the defendants are entitled to summary judgment on all claims except the

claim under Article 24 of the Maryland Declaration of Rights, which will be dismissed.


## BACKGROUND

**Procedural History**

In her original *pro se* civil rights complaint,[5] Ms. Farmer claimed that her August 2002

transfer to and isolated confinement in MCAC until May 20, 2003 [6] exacerbated her medical and

mental health disorders and caused her physical and mental health to deteriorate.  (Compl. ¶ 6.)

Her complaint further alleged that her "emergency" transfer from the Roxbury Correctional

Institution ("RCI") to MCAC occurred without affording her due process and pre-transfer

examination by a psychologist, which would have been required had the transfer not been

inappropriately categorized as an "emergency".  (*Id*. at ¶¶ 14-15, 23, 40, 51-9.)

---

[5]   It is not clear if Ms. Farmer exhausted her administrative remedies prior to filing this complaint, but the defendants have not raised this as an affirmative defense, and the case is not subject to dismissal for failing to allege exhaustion in the pleadings.  *See Anderson v. XYZ Corr. Health Servs*, 407 F.3d 674, 681 (4th Cir. 2005) (characterizing failure to exhaust as an affirmative defense rather than a pleading requirement) (internal citations omitted).

[6]   On May 20, 2003, Ms. Farmer was transferred to the Maryland Correctional Institution in Hagerstown, Maryland.   On February 15, 2005, she was court-released from DOC custody, but on approximately January 18, 2007, she was back in DOC custody based on new charges.  Ms. Farmer has been in Brockbridge Correctional Facility since February 10, 2007.

After the filing of the complaint, the court denied without prejudice Ms. Farmer's request to compel independent psychiatric and medical evaluations.  An appeal was taken from that decision, and the case remained on interlocutory appeal from January 14, 2003 until late April 2004.[7]  In the interim, the defendants filed a motion to dismiss, and Ms. Farmer filed an opposition and various non-dispositive motions.  On September 8, 2003, the court denied in part and granted in part the defendants' motion to dismiss and then appointed counsel to represent the plaintiff.

Following several extensions, Ms. Farmer's second[8] amended complaint for compensatory and punitive damages was filed by counsel on April 21, 2004.  (Docket entry nos. 29 & 32.)  The defendants filed a motion to dismiss or for summary judgment on July 29, 2004 (docket entry no. 47), and after several extensions, Ms. Farmer filed her opposition on March 1, 2005 (docket entry no. 57).   For administrative reasons, on March 11, 2005, the defendants' motion to dismiss or for summary judgment was denied without prejudice, subject to renewal at the request of counsel. The defendants filed their reply brief on May 11, 2005 and sought to renew their dispositive motion at that time as well.  (Docket entry nos. 63 & 64.)  The parties subsequently filed informal notices and briefing letters regarding the Supreme Court's decision in *Wilkinson v. Austin*, 545 U.S. 209, 220-21 (2005) (holding that prisoners had a liberty interest in avoiding transfer to Ohio's Supermax facility but that the multi-tier process of a new policy by which these transfers

---

[7]   The United States Court of Appeals for the Fourth Circuit appointed a guardian ad litem for Ms. Farmer to determine whether the denial without prejudice of her motion to compel independent medical and psychiatric evaluations was sufficient protection of her rights.  Following the guardian's report, the Fourth Circuit dismissed the appeal without prejudice.

[8]   Ms. Farmer, acting *pro se*, amended her complaint on one prior occasion (docket entry no. 5) and supplemented it on another (docket entry no. 7).

are made comported with due process requirements) and its potential impact on Ms. Farmer's

suit. **Factual History**

Ms. Farmer has AIDS[9] and has experienced other physical and mental health problems,

including, but not limited to, CMV retinitis, peripheral neuropathy, hepatitis, anxiety, and

depression.[10]  She has spent years in prisons around the country and has brought many legal

challenges to her treatment while in custody and to the conditions of her various places of

confinement.[11]

In 2002, Mr. Ford, then captain at the Maryland House of Correction in Jessup ("MHC-

J"), had reason to believe that Ms. Farmer was involved in an identity theft scheme to obtain

credit in the names of wardens at MCH-J and its annex ("MHCA-J").[12]  There is no dispute that

---

[9]   The second amended complaint describes her as having advanced  HIV infection (2d Am.
      Compl. ¶ 16), which one of the defendants' experts says meets the Center for Disease
      Control's criteria for full-blown AIDS.  (Mot. Dismiss or Summ. J., Ex. 13, Letter from
      Dr. William Ruby [hereinafter "Ruby Letter"] ¶ 1a); *see also Farmer v. Hawk-Sawyer*,
      69 F. Supp. 2d 120,  121 (D.D.C. 1999) (describing Ms. Farmer as having AIDS).

[10]  The only psychiatric problems listed in the second amended complaint are anxiety and
      depression, but it seems as if she has suffered from other conditions as well.  For
      instance, a declaration from Dr. David Donovan, who reviewed her medical records,
      states that she  is bi-polar (Pl.'s Opp'n, Ex. B, Dr. David Donovan Decl. [hereinafter
      "Donovan Decl."] ¶ 8c); records from Dr. Stephen Dunn, who treated her at MCAC,
      states that she has dysthymic disorder (Mot. Dismiss or Summ. J., Ex. 10, Summary of
      Encounters with Douglas Farmer [hereinafter "Dunn Summary"]); and she has also been
      found to have suffered from "gender dysphoria (or gender identity disorder), a medically
      recognized psychological disorder," *Hawk-Sawyer*, 69 F. Supp. 2d at 120-21.

[11]  Ms. Farmer's convictions include both state and federal crimes involving theft and
      forgery.  *See Circuit Court of Maryland for Baltimore County*, 31 F.3d at 220 (describing
      convictions and sentences).

[12]  Previous litigation before the court indicates that a confidential informant at MHC
      claimed that on July 16, 2002, he was given a letter by another inmate to be forwarded to
      inmate Larry Bush.  The letter, which was instead provided to MHC prison authorities,
      contained the names, addresses, and social security numbers of Wardens Hutchinson and
      Peguese and was to be forwarded to "Douglas Farmer" to create problems for the
      wardens.  *See Bush v. Kavanaugh, et al.*, Civil Action No. AMD-02-3780, docket entry

an informant had provided information implicating Ms. Farmer and another DOC inmate, Larry

Bush,[13] in this scheme.  Ms. Farmer claims that no credible information linked her to any such

plan, but she was nonetheless recommended for transfer from RCI upon the order of Mr. Sacchet,

RCI's then warden, pending investigation into the matter.  She asserts that initial

recommendations to transfer her to MHC-J and the Maryland Correctional Institutions in Jessup

and Hagerstown (respectively, "MCI-J" and "MCI-H") were declined, as administrators at all

three facilities refused to accept her into their custody.  On August 16, 2002, Ms. Leisinger, a

case manager at RCI, recommended that Ms. Farmer be transferred to MCAC on an emergency

basis due to the allegations against her and the ensuing investigation.  The decision was approved

by Mr. Miller, also an RCI case manager, Mr. Kavanagh, then deputy commissioner of DOC, and

Mr. Sacchet.

Ms. Farmer was not afforded any type of process prior to being sent to MCAC on August

22, 2002.[14]  She also alleges that she did not receive a psychological and psychiatric evaluation

---

no. 23, Exs. 2A1-2A3.

[13]   Larry Bush also filed a civil rights action challenging his emergency transfer to MCAC.
*See Bush v. Kavanaugh, et al.*, 2004 WL 5040000 (D. Md. 2004) (unpublished).  This
court granted summary judgment in favor of defendants, concluding that Mr. Bush had
failed to show a Fourteenth or Eighth Amendment violation with regard to his due
process, failure-to-protect, or conditions of confinement claims arising out of his
administrative segregation assignment and transfer and housing at MCAC.  That decision
was affirmed by the United States Court of Appeals for the Fourth Circuit.  *See Bush v.
Kavanaugh*, 109 Fed. Appx. 623 (4th Cir. 2004) (unpublished).

[14]   Ms. Farmer's status while at MCAC is not fully clear. The internal MCAC documents
filed with the second amended complaint state that Ms. Farmer was assigned to the
general population at MCAC (*see* 2d Am. Compl., Exs. F & I), however, the
investigative report on the alleged identity theft scheme suggests she was on
administrative segregation while at MCAC (*see id.*, Ex. H).  As her claims turn on the
conditions and treatment to which she was subjected, which are adequately set forth in
the pleadings and supporting materials, labeling her status precisely is not necessary.
Furthermore, treatment of inmates in MCAC's general population and on disciplinary
segregation seem to have the relevant traits, from a legal perspective, in common.  No

within twenty-four hours of her arrival at MCAC, as DOC policy requires for emergency transfers, but instead not until two weeks after her arrival.  (*See* Pl.'s Opp'n, Ex. J, Division of Correction Directive [hereinafter "DCD"] 100-161, § III.C.4 (May 15, 1999)).[15]  She alleges that, while she was at MCAC, her access to medical providers was not as good as it had been during her other confinements and her medications were not delivered regularly.  At one point during her time at MCAC, she was temporarily transferred to a facility for in-patient mental health care, Correctional Mental Health Center in Jessup ("CMHC-J"), for two weeks.  She was first recommended for transfer out of MCAC on April 11, 2003 and, after the necessary approvals were obtained, on May 20, 2003 she was sent to MCI-H.   An investigation into the alleged identity theft scheme at RCI did not reveal any evidence that Ms. Farmer or the other accused inmates were attempting to perpetrate such a scheme.  (*See* 2d Am. Compl., Ex. H.)

The state prisoners at MCAC consist of three populations: "a general population . . . who pose[s] a risk of violence toward others and/or are a risk to the security and safety of the institution"; inmates serving at least 180 days on disciplinary segregation; and inmates who have received a death sentence.  (*See* Pl.'s Opp'n, Ex. C, DCD 100-160, §§ III.B.1-3 (Feb. 1, 1997, updated Feb. 1, 1998)). Those in the last category are treated differently from those in the other two categories in a variety of respects, so they are not included in the description, analysis, and conclusions of law that follow.  Prisoners in the first two categories arrive at MCAC only by way of transfer from other DOC institutions, *Dupree v. Brown*, 2003 WL 23573439, *1 (D. Md. 2003) (unpublished), *aff'd* 89 Fed. Appx. 417 (4th Cir. 2004) (unpublished), and they seem to be subject

---

explanation is given anywhere for what difference, if any, there may be between administrative and disciplinary segregation.

[15]   All references to DCDs after the initial reference to each DCD will refer to the DCD by number only rather than providing a complete citation.

to the same basic conditions, described below.[16]  (Any divergence in the groups' treatment will be

noted.)  The Commissioner or the Commissioner's designee is responsible for approving

transferees' assignments either to the general population or disciplinary segregation.  (DCD 100-

160, § III.C.) As part of the transfer process, inmates in both groups are given a transfer category

based on the predicate for their transfer; for all but two of these categories, the length of time to

be spent at MCAC is governed by DCD (but subject to variation in individual cases).  (*Id.* at §

III.E.)   For the other two, it is subject to the Commissioner's discretion. (*Id.*)

MCAC is the State of Maryland's most secure facility; such facilities exist across the

country and are referred to as  "Supermaxes".  *See Rich v. Bruce*, 129 F.3d 336, 336-37 (4th Cir.

1997) (identifying MCAC as the "most secure penal institution in Maryland, designed to house

inmates with the most serious behavioral and management problems"); *see also Wilkinson*, 545

U.S. at 213-14 (explaining the origins of Supermaxes and their frequency across the country).[17]

To maintain the highest level of security, MCAC imposes many restrictions on inmates; "it has

---

[16]   The stated purpose of DCD 100-164 (Pl.'s Opp'n, Ex. F (Feb. 1, 1997)) is "[t]o establish
conditions of confinement for inmates housed at MCAC."  (*Id.* at § II.)  It does not
expressly limit its contents to certain prison populations; indeed, all three groups are
mentioned in places.  (*See*, *e.g.*, *id.* at §§ III.D, III.M.)  DCD 100-162 (Pl.'s Opp'n, Ex. E
(Mar. 7, 2003))  provides that inmates in the general population are subject to the
conditions set out in 100-164.  None of the DCDs included in the record make the same
provision for inmates in disciplinary segregation; however, this group's inclusion in DCD
100-164 implies that those conditions apply to them as well (except where otherwise
indicated).  Given that segregation status is meant to impose more stringent conditions
than general population status, it follows that inmates in segregation would be subject to
at least the same restrictions as those in the general population.  Thus the conditions set
forth in DCD 100-164 that are not expressly limited to a certain population may be
understood as applying to inmates in both relevant groups.

[17]   Pursuant to an intergovernmental agreement with the United States Marshals, federal pre-
trial detainees also are housed at MCAC.  *See United States v. Wallen*, 177 F. Supp. 2d
455, 456-57 (D. Md. 2001).  They do not come within the scope of this case.

single cells,[18] limited inmate movement, limited physical contact between inmates, and limited physical contact between inmates and officers.  There are detailed procedures for searching and securing inmates whenever they are removed from their cells."  *Rich*, 129 F.3d at 336-37; *see also* Md. Code. Regs. 12.02.08.01 § B.11 (2007) (stating that MCAC's features include "single-celling, extremely limited institutional movement, constant observation, and limited inmate-to-staff and inmate-to-inmate contact").[19]

Other restrictions include limiting the number of visits (all of which are non-contact except with counsel), limiting recreation,[20] limiting showers, and strip-searching inmates at certain times.[21]  (Pl.'s Opp'n, Ex. F, DCD 100-164, §§ III.B.2, III.C, III.G.1, III.M.1 (Feb. 1, 1997).)  Inmates at MCAC are not permitted to engage in religious worship outside of their cells (*id.* at § III.N), nor can they work and earn credits that will decrease the length of their sentence

---

[18]   According to DCD 100-164, § III.A.1 inmates not under a sentence of death may be double-celled if they have "satisfactory adjustments" to life at MCAC.  Ms. Farmer was in a cell by herself.  Nothing in the record indicates that double-celling occurs; indeed, given Supermax's stated mission of providing incarceration at the "highest security level"and that state regulation provides for "single-celling", it seems doubtful that double-celling happens frequently, if at all.  Md. Code. Regs. 12.02.08.01 § B.11 (2007)

[19]   Ms. Farmer swears that she was strip-searched daily, followed by a search of her cell.  Before the cell was searched, she would sometimes have to back out of it on her hands and knees while she was naked.  (Pl.'s Opp'n, Ex. A, Farmer Decl. [hereinafter "Farmer Decl."] ¶ 19.)

[20]   The plaintiff states that recreation usually was allowed for an hour each weekday, with no recreation available on the weekends.  Recreation, at least for many MCAC inmates, takes place in "full restraints".  (Pl.'s Opp'n, Ex. H, DCD 100-166, § VI.A.1.j (Aug. 5, 2002).)

[21]   Policies and procedures at MCAC are established in unpublished DCDs. Ms. Farmer has provided directives to the court which cover the time of her confinement in MCAC.  When information is added based on Ms. Farmer's allegations or sworn testimony, it is so identified.  It appears as if DCDs 100-160, 161, 162 and 164 are still essentially the same as when Ms. Farmer was at MCAC; how the most recent version of DCD 100-166, governing "Quality of Life Incentive" program ("QLIP"), compares is unknown.

(Pl.'s Opp'n, Ex. A, Farmer Decl. [hereinafter "Farmer Decl."] ¶ 7).  Ms. Farmer also alleges that

there was no access to a law library or educational opportunities, and she swears that there was

"constant noise", even at night, and bad lighting conditions (*id.* at ¶¶ 13-14).

　　　During part of Ms. Farmer's time at MCAC, some, if not all, inmates[22] were subject to a

"Quality of Life Incentive" behavior modification program ("QLIP") which assigned them to one

of five levels with corresponding privileges.[23]  *See Dupree*, 2003 WL 23573439 at *2 (D. Md.

2003) (characterizing the QLIP as making life at MCAC "not a matter of 'all stick, no carrot'").

The QLIP severely restricted inmates' ability to possess personal property and clothing until

correctional officers determined that their behavior had improved, at which point they would be

permitted to have additional items and privileges on a very limited basis.  (*See* Pl.'s Opp'n, Ex. H,

DCD 100-166 (Aug. 5, 2002); Ex. I, Institutional Bulletin [hereinafter "Institutional Bulletin"]

(Feb. 12, 2002) (describing the program and informing inmates about it).)

　　　Ms. Farmer claims to have suffered various physical and psychological harms as a result

of her transfer to and confinement in MCAC.  These allegations will be discussed in greater detail

---

[22]　It is not clear whether inmates in both the general population and in disciplinary segregation were subject to the QLIP.  At least at the program's inception, it appears as if it applied to both groups of inmates.  (*See* DCD 100-166, § VI (referring to "each inmate" receiving orientation about the QLIP); Institutional Bulletin (describing the QLIP; sent to all MCAC inmates), *but see* DCD 100-166, § VI.D.1.A (stating that an inmate who has reached level four may be housed in the general population, suggesting that inmates at the lower levels of the QLIP were not already in the general population)).  It is not necessary to resolve the matter, however, because, as previously discussed, MCAC's central characteristics were common to the experiences of both groups of inmates.

[23]　These levels were not identical to the transfer categories assigned to inmates upon their arrival at MCAC.  (DCD 100-166, § VI.E.)  New arrivals and those at higher levels who subsequently displayed inappropriate behavior were placed at level one.  (*Id.* at § VI.A.)  Movement to higher levels was contingent on compliance with MCAC rules and staff, and inmates were reviewed for movement to the next level following the passage of certain time periods. (*Id.* at §§ VI.A.2, B.2, C.2, D.2, E.2.)

below, as they involve contested issues, but briefly, the alleged harms include an increased risk of

opportunistic infections[24] due to limited showering, a worsening of her eyesight due to lighting

conditions, increased viral loads (that is, a greater prevalence of the HIV virus in her system),

anxiety, and depression.


## ANALYSIS

Ms. Farmer alleges that her rights to due process and freedom from cruel and unusual

punishment under the United States[25] and Maryland Constitutions were violated both in her

transfer to MCAC and her continued incarceration there.  Her § 1983 claims will be addressed

first because the state constitutional provisions are interpreted *in pari materia* with the United

States Constitution, *see Evans v. State*, 914 A.2d 25, 67, 396 Md. 256, 327 (2006), so much of the

same analysis will apply to them.

**Summary Judgment Standard**

Because materials other than the pleadings are being considered, this motion will be

treated as one for summary judgment only.  Rule 56(c) of the Federal Rules of Civil Procedure

provides that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and
> admissions on file, together with the affidavits, if any, show that there is no genuine issue

---

[24]  She does not claim that any new opportunistic infections in fact occurred while she was
at MCAC.

[25]  Her federal constitutional claims under the Eighth and Fourteenth Amendments are
brought pursuant to 42 U.S.C. § 1983; the Eighth Amendment applies to the states
through the Due Process Clause of the Fourteenth Amendment.  *See Wilson v. Seiter*, 501
U.S. 294, 296-97 (1991) (internal citations omitted).  She claims state constitutional
rights pursuant to Article 24 of the Maryland Declaration of Rights (due process) and
Articles 16 and 25 (freedom from cruel and unusual punishment).

as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club*, *Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr.*, *Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

**Fourteenth Amendment Claims**

Ms. Farmer alleges that in ordering her transfer from RCI to MCAC, Mr. Kavanagh, Mr. Sacchet, Ms. Leisinger, and Mr. Miller deprived her of her liberty without due process of law (count III).  She brings a separate procedural due process claim against Mr. Kavanagh, Ms.

Allen, Mr. Smith, and Ms. Fisher for similarly depriving her by continuing her segregated

confinement at MCAC (count V).

The threshold inquiry with respect to Ms. Farmer's due process claims is whether she had

a liberty interest in avoiding transfer to or continued incarceration at MCAC.  *See Wilkinson*, 545

U.S. at 221 (explaining that "the question of what process is due" is only reached if a

"constitutionally protected liberty interest" is established).  Turning first to her claim that her

transfer violated her due process rights, "the Constitution itself does not give rise to a liberty

interest in avoiding transfer to more adverse conditions of confinement . . . [but] a liberty interest

in avoiding particular conditions of confinement may arise from state policies or regulations,

subject to the important limitations set forth in *Sandin v. Conner*."[26]  *Id.* at 221-22 (internal

references omitted).  In assessing whether a prisoner has a liberty interest in avoiding a given

governmental action or type of confinement, the Fourth Circuit has explained that

---

[26]  As the Fourth Circuit explained: "Prior to the decision of the Supreme Court in *Sandin*, the analysis of whether a prisoner was deprived of a liberty interest focused not on the nature of the deprivation experienced by the prisoner, but on the language of the applicable prison regulations and whether such language was 'mandatory'." *Beverati v. Smith*, 120 F.3d 500, 503 n.3 (4th Cir. 1997) (internal references omitted).  This approach yielded "at least two serious and detrimental consequences," which "led the *Sandin* Court to retreat from the mandatory language approach of *Hewitt v. Helms*." *Id.* (internal references omitted).  In *Wilkinson*, the Supreme Court confirmed the complete nature of this retreat, characterizing *Sandin* as "abrogat[ing] the methodology of parsing the language of particular regulations."  545 U.S. at 222 (internal citations omitted).  *See also id.* (stating that "it is clear [post-*Sandin*] that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'") (internal citations omitted).  The *Wilkinson* Court did not analyze the relevant Ohio regulations to see if a liberty interest existed, and this court has looked at the applicable Maryland ones only as factual background about the conditions inmates experience at MCAC.  The defendants' attempt to distinguish this case from *Wilkinson* based on the nature of the language of Maryland's regulations as compared to Ohio's is thus unpersuasive.

[s]tates may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless *imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life*.

*Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997) (emphasis in the original) (quoting *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995)). In *Beverati*, the Fourth Circuit held that the plaintiffs' placement in administrative segregation did not, upon comparison with "those [conditions] they could expect to experience as an ordinary incident of prison life," constitute the type of hardship necessary to give rise to a liberty interest in avoiding such placement. *Id.* at 502-04 (internal citations omitted). In reaching this conclusion, the Fourth Circuit stated that "[t]his analysis necessarily is fact specific in that it requires a determination of the conditions the prisoner maintains give rise to a liberty interest and those incident to normal prison life." *Id.* at 503 (internal citations omitted).

The "fact specific" nature of this inquiry thus requires the court to examine the conditions at MCAC Ms. Farmer claims result in a protected liberty interest in avoiding transfer there, followed by those attendant to normal prison life. Similar conditions were challenged in *Wilkinson*, in which a group of inmates argued they had a protected liberty interest in not being transferred to Ohio's Supermax ("OSP"). The conditions at OSP were "synonymous with extreme isolation " and "almost every aspect of an inmate's life is controlled and monitored," thus "[i]t is fair to say OSP inmates are deprived of almost any environmental or sensory stimuli and of almost all human contact." *Wilkinson*, 545 U.S. at 214. While there are some minimal differences between conditions in OSP and MCAC (for instance, all visits in OSP were non-contact, *id.*, while at MCAC, contact is sometimes allowed for visits with an attorney), both are characterized by an absence of stimulation and interpersonal connection.

13

Such deprivation exists in "most solitary confinement facilities,"[27] *id.* at 223-24, thus the presence of two additional factors was crucial to the Court's unanimous decision that assignment to OSP imposed "an atypical and significant hardship" on inmates such that they had a liberty interest in avoiding it. *Id.* at 224 (applying *Sandin* standard). These factors were the potentially indefinite length of detention in OSP, limited only by the length of the underlying sentence, and being rendered ineligible for parole due to confinement at OSP. *Id.* Considering these two factors, as well as the extreme deprivation OSP inmates faced, the Court explained that "[w]hile any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context," giving rise to a protected liberty interest in avoiding placement there. *Id.*

MCAC shares aspects of one of these two key features of OSP, though it is not identically replicated. The parties agree that inmates housed at MCAC do not become categorically ineligible for parole (Informal briefing letters, docket entries no. 65 & 66), although Ms. Farmer swears that confinement there adversely affected her chances of parole (which she was not yet eligible for upon transfer to MCAC) and that no one she was aware of had ever been paroled from MCAC (Farmer Decl. ¶ 22). Regulations limit the amount of time prisoners may spend at MCAC and provide for reviews of their placement at various intervals, however, there are two categories of prisoners, one of which included Ms. Farmer, whose time at MCAC is limited only by the discretion of the commissioner, which is hardly a firm limit. (Pl.'s Opp'n, Ex. J, DCD 100-161, § III.E (May 15, 1999) and App. 5 (Apr. 1, 2001).)[28]

---

[27]  Even in other solitary confinement situations, however, it is likely that inmates have more human contact than they do in a Supermax. *See Wilkinson*, 545 U.S. at 224.

[28]  Because the existence of time limits on the length of confinement at a Supermax is one of the variables assessed when determining if a liberty interest in avoiding transfer to

While the defendants view these distinctions between OSP and MCAC as establishing that placement at MCAC does not "impose an atypical and significant hardship within the correctional context," *Wilkinson*, 545 U.S. at 224, this argument misconstrues *Wilkinson*'s approach. *Wilkinson* does not set forth a checklist of factors, all of which must be present, to hold that a protected liberty interest in avoiding transfer to a supermax prison exists, but instead directs lower courts to consider the totality of circumstances in a given facility. *See id.* The conclusion in *Wilkinson* that general conditions of solitary confinement, along with lack of time limits on placement and categorical ineligibility for parole, give rise to a protected liberty interest does not mean that essentially the same conditions, accompanied by a lack of time limits for some prisoners and potentially adverse impacts on parole eligibility for all prisoners do not also establish such an interest. *Cf. Westefer v. Snyder*, 422 F.3d 570, 589-90 (7th Cir. 2005) (relying on *Wilkinson* to hold that a claim of liberty interest in avoiding confinement in highest security prison in Illinois– where prisoners have continued eligibility for parole but no time limits on confinement– survives a motion to dismiss; emphasizing that the *Wilkinson* court expressly considered the total set of circumstances in the prison rather than any one variable). Like OSP, MCAC features the most restrictive conditions in the state. *See Wilkinson*, 545 U.S. at 214; *Rich*, 129 F.3d at 336-37. These conditions deprive inmates of "almost any environmental or sensory stimuli and of almost all human contact," *Wilkinson*, 545 U.S. at 214, potentially for the length of some inmates' underlying sentences and potentially with reduced opportunity for parole for all inmates– severe conditions indeed.

---

such a facility exists, *see Wilkinson*, 545 U.S. at 224, to the extent Ms. Farmer's procedural due process claim rests on her continued confinement at MCAC, inquiry into whether there is a separate interest in avoiding continued confinement seems unnecessary; rather it is subsumed into the analysis under *Wilkinson*.

In order to determine whether this situation imposes "an atypical and significant hardship within the correctional context", it must be measured against a baseline. *Id.* at 223-24 (citing, *inter alia*, *Sandin*, 515 U.S. at 483-84). *Wilkinson* did not establish what this baseline should be, concluding that being sent to OSP constitutes such a hardship "under any plausible baseline". *Id.* at 223 (noting that the Courts of Appeals have not reached agreement on the appropriate baseline) (citing, *inter alia*, *Beverati*, 120 F.3d at 504). The Fourth Circuit uses the conditions "imposed on the general prison population" as the baseline for this analysis. *Beverati*, 120 F.3d at 504. Because the plaintiffs in *Beverati* had been moved within the same prison only, from the general population to administrative segregation, *id.* at 501-02, the baseline was the general population in that prison. Because Ms. Farmer was moved from RCI, where she was in the general population, to MCAC, where her status was unclear but even the general population was subjected to segregated-type conditions, the appropriate baseline seems to be the conditions faced by the general population in RCI, a medium security prison, not the general population in MCAC. *See Patrick v. Sec'y, Dep't Pub. Safety and Corr. Servs.*, 847 A.2d 450, 460, 156 Md. App. 423, 439 (Ct. Spec. App. 2004) (explaining that in the "absence in the record of *any* evidence of conditions at MHC-X [Maryland House of Correction Annex], the facility from which appellant came and to which he wishes to return, we cannot know whether conditions at MCAC impose atypical and significant hardship on appellant in relation to the ordinary incidents of prison life") (italics in the original); *see also Walsh v. Corcoran*, 210 F.3d 364, *7 (4th Cir. 2000) (unpublished) (characterizing *Beverati* as "using the incidents of prison life that flowed from the inmates' original sentences as a baseline for comparison with conditions in

administrative segregation" and applying that baseline to the case where the plaintiff's due

process challenge stemmed from transfer between institutions).[29]

Ms. Farmer swears that conditions at MCAC were the worst she has ever experienced

over the course of her many confinements in state and federal facilities, "far worse than even

segregation at any other prison".  (Farmer Decl. ¶¶ 17-18.)  She alleges that she was able to take

more showers at RCI and that her access to medical providers was better there; she also swears

that she had a job at RCI which she lost upon placement in MCAC (*id.* at ¶ 7).  In addition to

identifying these specific areas, Ms. Farmer also supplies information about life at RCI by

negative implication.  She states that the QLIP was used only at MCAC and, even at its most

permissive stage (level 5), "still presents a drastic contrast to conditions of incarceration in the

general population of any other Maryland detention facility."  (2d Am. Compl. ¶¶ 64-64.)

Inmates who have reached level 5 in the QLIP may have some or all of these opportunities:

housing with MCAC's general population (DCD 100-166, §§  VI.D.1.a, E.1.a ), having a radio

(*id.* at § D.1.b), buying commissary items in the amount of $20 over hygiene items (*id.* at §

E.1.c), having a television not provided by MCAC (*id.* at § E.1.b), receiving one visit per week

(*id.* at § E.1.c), and eating and recreating in a group (with the necessary approval) (*id.* at § E.1.e).

Thus although she does not detail the exact policies and practices of RCI in these areas, Ms.

Farmer nonetheless provides a sense of them by identifying even level 5 circumstances as more

restrictive.

---

[29]   In the suit brought by Mr. Bush, who was implicated in the same alleged identity theft
scheme as Ms. Farmer, this court found the plaintiff's "contention that [his transfer to
MCAC] violated due process" flawed because "he has not demonstrated that the
conditions of his assignment to MCAC were significantly more onerous than that at
MHC [Maryland House of Correction], where he was previously incarcerated."  *Bush*,
2004 WL 5040000 at *3 (citing, *inter alia*, *Beverati*).

While the record does not exhaustively depict life in the general population at RCI, it provides information adequate to support the plaintiff's contention that compared to RCI, or any other prison in the state, essentially every aspect of life at MCAC is more restricted.  *See Rich*, 129 F.3d at 336 (recognizing MCAC as "the most secure penal institution in Maryland, designed to house inmates with the most serious behavioral and management problems").  Furthermore, the conditions at MCAC do not require comparison to each and every detail of life at RCI or elsewhere to conclude that, taken together, they rise to the level of an "atypical and significant hardship".  *Wilkinson*, 545 U.S. at 223.  In light of the prohibition of "almost all human contact," coupled with severe restrictions on movement or any type of activity, both of which may last for the duration of some inmates' underlying sentences, and may be less likely to be relieved by parole than the less arduous conditions at other facilities, the conditions at MCAC create such a hardship when judged against "any plausible baseline".  *Id.*  Inmates thus have a protected liberty interest in avoiding transfer to MCAC.  *Id.* at 224 (citing *Sandin*, 515 U.S. at 483).

Turning now to the second part of the due process analysis, the question becomes what process inmates are entitled to when the DOC seeks to transfer them to MCAC.  *See id.* at 224.  Three factors must be considered in deciding whether the procedures used provide sufficient process:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 224-25 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).  The private interest is the "inmate's interest in avoiding erroneous placement" at MCAC.  *Id.* at 225.  Although this

interest is "more than minimal", it is not as strong as it would be for a non-inmate because an inmate faces a "curtailment of liberties" by virtue of his presence in the correctional system. *Id.*

At the time of Ms. Farmer's placement at MCAC, both non-emergency and emergency transferees were handled in a similar manner[30]: decisions were made by DOC officials without affording the transferee any notice or opportunity for comment.[31]  To effectuate a non-emergency transfer, case management staff at the facility where the inmate is currently incarcerated must complete a form recommending transfer to MCAC, supported by the reasons for the recommendation.  (DCD 100-161, § III.B.3.a.)  The warden or assistant warden then approves or disapproves the request and, if the request is approved, additional information is sent to the director of case management for ultimate review by the DOC Commissioner or his or her designee.  (*Id.* at §§ III.B.3.b-c.)  The Commissioner/designee has three working days to give final approval or disapproval of the transfer.  (*Id.* at § III.B.3.d.)

To carry out an emergency transfer, the warden or assistant warden at the facility where the inmate is at that time puts in the request to the Commissioner's office, where the Commissioner/designee will make any necessary changes to the form (such as transfer category) and then distribute signed copies of it to the relevant officials.  (*Id.* at §§ III.C.1-3.) Interestingly, no mention is made of the Commissioner/designee approving or disapproving the request.  While this power may be inherent in the Commissioner's role, its omission from the established procedures suggests that emergency requests are generally approved, effectively making the warden/assistant warden the only real decision-maker.

---

[30]   There is no reason to believe this process has been changed since Ms. Farmer was transferred.

[31]   This description does not include the psychological screening requirements, as those relate to the Eighth Amendment claims and are discussed below.

Transferees in both categories are entitled to a review by MCAC's case management staff within ten working days of their transfer.  (*Id.* at § III.D.)  At this time, the newly-transferred inmate is to be informed of the reasons he was transferred, the time parameters for his stay at MCAC, the earliest date he could be transferred out of MCAC, and the requirements for obtaining early transfer.  (*Id.*)  No mention is made of the inmate having the opportunity as part of this review to offer reasons why his transfer should not have taken place.

Ms. Farmer was designated an emergency transfer.  She claims she was given no explanation for the move or any opportunity to be heard prior to its taking place (Farmer Decl. ¶ 6)  or after her incarceration at MCAC (2d Am. Compl. ¶ 82).  It is not clear from the record whether Ms. Farmer had the initial review by an MCAC case manager provided for in DCD 100-161 , however, as will be discussed further below, even if she did, it still would not have provided constitutionally sufficient process because it did not include a pre-transfer opportunity to be heard.

The transfer system described above creates a high risk of erroneous deprivation of the private interest because it fails to provide any opportunity at any point for the transferee to be informed of and to challenge the reasons for his transfer.  The core constitutional requirements for process are thus entirely absent.  *See Wilkinson*, 545 U.S. at 225-26 (explaining that "notice of the factual basis" for transfer to a Supermax facility and "a fair opportunity for rebuttal" are both "among the most important procedural mechanisms for purposes of avoiding erroneous deprivations") (internal citations omitted).  Under these circumstances, it is hardly proper to speak of the potential value of "additional or substitute procedural safeguards" but instead of the fundamental need for basic procedural safeguards along the lines of Ohio's new policy described

in *Wilkinson*, 545 U.S. at 216-18.[32]  In Ms. Farmer's case, had she been afforded some type of process, she would have been able to respond to the allegations of identity theft (which she was eventually cleared of) before she was labeled a threat to prison security.  *See Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999) (explaining that "if an inmate is to be placed in atypical confinement (considering both the conditions and the duration) after being determined, for example, to be a threat to prison safety, he should have some procedural due process surrounding the determination that he poses a threat").  Additionally, she could have sought to inform the decision-makers of the serious physical and mental health conditions that made MCAC a poor, and perhaps dangerous, placement for her, as will be discussed further below.

The third factor, the government's interest, is a "dominant consideration" in the context of prison management.  *See Wilkinson*, 545 U.S. at 227 (stating that the government's "first obligation must be to ensure the safety of guards and prison personnel, the public, and the prisoners themselves") (internal citations omitted).  The defendants have not shown that the right to a pre-transfer hearing would impede their ability to satisfy this obligation.  Weighing the three *Mathews* factors thus reveals the system in place at the time of Ms. Farmer's transfer to MCAC (which is believed to be the same today) not to be adequate to protect an inmate's liberty interest in avoiding transfer to MCAC.

Despite the violation of Ms. Farmer's Fourteenth Amendment rights, the defendants are entitled to summary judgment on qualified immunity grounds, because *Wilkinson* was not decided until 2005, some years after Ms. Farmer was removed from MCAC.  To determine the applicability of qualified immunity, the court follows a two-step analysis.   First, it must

---

[32]   This policy does not permit the inmate contesting his transfer to call witnesses, but it does afford him a pre-transfer opportunity to be heard in an informal, non-adversarial manner.  *Wilkinson*, 545 U.S. at 228-29.

determine whether the facts viewed in the light most favorable to Ms. Farmer establish the

deprivation of a constitutional right. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Wilson v.

Layne*, 526 U.S. 603, 609 (1999).   If so, the court then proceeds to determine whether at the time

of the alleged violation the constitutional right was "clearly established" and "whether a

reasonable person in the official's position would have known that his conduct would violate that

right." *Taylor v. Waters*, 81 F.3d 429, 433 (4th Cir. 1996) (quoting *Gordon v. Kidd*, 971 F.2d

1087, 1093 (4th Cir. 1992)); *see also Henderson v. Simms*, 223 F.3d 267, 271 (4th Cir. 2000).

"Clearly established" for purposes of qualified immunity analysis means that the "'contours of

the right must be sufficiently clear that a reasonable official would understand that what he is

doing violates that right.'" *Layne*, 526 U.S. at 614-15 (internal references omitted); *Anderson v.

Creighton*, 483 U.S. 635, 640 (1987).   Importantly, the right must be "clearly established" "at the

appropriate level of specificity," which requires in turn that the court's analysis "proceed 'at a

high level of particularity.'" *Knussman v. Maryland*, 272 F.3d 625, 637-38 (4th Cir. 2001)

(quoting, *inter alia*, *Edwards v. City of Goldsboro*, 178 F.3d 231, 250-51 (4th Cir. 1999)).

     Ms. Farmer has established the deprivation of a constitutional right.  This right, however,

was not clearly established at the time of her transfer.  Neither the Supreme Court, the Fourth

Circuit, this court, nor the Maryland courts had then held that inmates had a liberty interest in

avoiding transfer to MCAC.  To the extent the question had been considered, courts had said no

such interest existed.  In *Patrick v. Corcoran*, Civil Action No. AMD-00-2258, the issue of a

protected liberty interest concerning transfer to and continued confinement at MCAC was raised

before this court; the case was stayed pending the resolution of parallel state court proceedings

and eventually dismissed voluntarily.  When the due process issue was considered by the Court

of Special Appeals of Maryland, the court concluded that no protected liberty interest existed in

avoiding transfer to and continued incarceration at MCAC.  *See Patrick*, 847 A.2d at 455-60.[33]

Similarly, in *Dupree v. Brown*, 2003 WL 23573439 (D. Md. 2003) (unpublished), *aff'd* 89 Fed.

Appx. 417 (4th Cir. 2004) (unpublished), this court concluded that "transfer of a special

management prisoner to Supermax does not amount to a violation of that individual's

constitutional rights," and that there was no "constitutionally protected liberty interest in

remaining in [a] general population [facility]" rather than being transferred to MCAC.  *Id.* at

*4.[34]  The defendants, therefore, are entitled to qualified immunity for all of the § 1983

procedural due process claims.

**Eighth Amendment Claims**

Ms. Farmer alleges that in ordering her transfer to MCAC, Mr. Kavanagh, Mr. Sacchet,

Ms. Leisinger, and Mr. Miller were deliberately indifferent to her serious medical needs (count

VII).  "There is nothing inherently harsh about a transfer," thus this count amounts to a "theor[y]

as to how individual defendants might be found to be personally involved in the other . . . alleged

Eighth Amendment violation[]" claimed by the plaintiff.  *Scarver v. Litscher*, 371 F. Supp. 2d

986, 998 (W.D. Wis. 2005).  The other alleged violation is that Mr. Kavanagh, Ms. Allen, Mr.

Smith, and Ms. Fisher showed deliberate indifference to the plaintiff's serious medical needs in

---

[33]   This conclusion is dictum because the issue had not been properly preserved for appeal, however, this does not diminish its significance for the purposes of discussing qualified immunity.  The court is relying on *Patrick*'s analysis of precedent for the conclusion that no protected liberty interest clearly existed at that time, rather than relying on *Patrick* itself as precedent.

[34]   The court addressed this as a preliminary matter only because the plaintiff was not challenging his transfer to MCAC but the imposition of the QLIP on him, once he was there, several months before the DOC formally adopted it.  *Dupree*, 2003 WL 23573439 at *4.

continuing her segregated confinement at MCAC (count IX).  Continuing a confinement, in and

of itself, also has "nothing inherently harsh" about it; rather, conditions of that confinement are

what would give rise to an Eighth Amendment violation.  Because Ms. Farmer has not brought

any additional counts identifying how specific conditions she faced at MCAC are

unconstitutional, the court must attempt to deduce which aspects of her time at MCAC she

contends violated the Eighth Amendment.

*Failure to Provide Medical Care*

The reference in counts VII and IX to Ms. Farmer's serious medical needs, as well as the

alleged facts concerning the delay in starting and the irregular delivery of her prescriptions,

suggest that she seeks to make a claim for failure to provide medical care.[35]  Failure to provide

medical treatment, when indicating a "deliberate indifference to serious medical needs of

prisoners," results in "the 'unnecessary and wanton infliction of pain'  . . . proscribed by the

Eighth Amendment."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal citations omitted);

*see also Brice v. Virginia Beach Correctional Ctr.*, 58 F. 3d 101, 104 (4th Cir. 1995) (assessing

whether a prisoner has a serious medical need must be done objectively).  Deliberate

indifference is shown by establishing that defendants had actual knowledge or awareness of a

plaintiff's serious medical needs requiring treatment and "declin[ed] to secure available medical

attention." *Id.* at 104-05 (citing, *inter alia*, *Brennan*, which established that deliberate

indifference requires that an "official knows of and disregards an excessive risk to inmate health

and safety; the official must both be aware of the facts from which the inference could be drawn

that a substantial risk of serious harm exists, and he must also draw the inference," 511 U.S. at

---

[35]   Ms. Farmer also alleges that her access to health care providers was not as good as it was
at RCI, however, the relative availability of health care providers does not provide
grounds for an Eighth Amendment claim.

837).  Establishing an Eighth Amendment violation thus requires the prisoner to "prove two

elements– that 'the deprivation of [a] basic human need was *objectively* "sufficiently serious,"'

and that '*subjectively* "the officials act[ed] with a sufficiently culpable state of mind.""' *Shakka*

*v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (internal citations omitted; italics and insertions in

original).

Ms. Farmer's medical conditions are objectively serious.  *See Taylor v. Barnett*, 105 F.

Supp. 2d 483, 487 (E.D. Va. 2000) (stating that "HIV-positive inmates and inmates suffering

from the AIDS virus clearly suffer from serious medical needs").  Failing to provide such inmates

access to life-sustaining drugs, as allegedly happened to Ms. Farmer during her time at MCAC ,[36]

"clearly is sufficiently objectively serious" to "establish the objective . . . component set forth in

*Estelle*".  *Id.  See also Nolley v. County of Erie*, 776 F. Supp. 715, 740 (W.D.N.Y. 1991)

(concluding that "[t]he several instances where plaintiff's AZT [drug used to treat HIV/AIDS]

was either not delivered or was delivered late, did . . . deprive plaintiff of a necessity of life under

the Eighth Amendment" thus satisfying "the objective component of an Eighth Amendment

violation") (internal references omitted).

The defendants argue that they are entitled to summary judgment on Ms. Farmer's failure

to provide medical care claims because she has not presented evidence showing that she suffered

---

[36]   Ms. Farmer identifies Kaletra as one of the drugs "missing most".  Farmer Decl. ¶ 9.
Kaletra is a protease inhibitor, which fights HIV by preventing cells carrying the virus
from making more of the virus.  This in turn decreases the amount of the virus in the
body as well as raising the  T-cell count of the person taking it.  *See* AIDSmeds.com,
http://www.aidsmeds.com/archive/Kaletra_1559.shtml (last visited on July 18, 2007).  T-
cells, also known as CD4 cells, are white blood cells necessary for the body to combat
infection and disease.  *See* Centers for Disease Control and Prevention,
http://www.cdc.gov/hiv/topics/basic/index.htm (last visited on July 18, 2007).

any harm as a result of the missed medications.[37]  While "even if the medical care [at a prison] is far from perfect, it is not actionable if the inmate suffered no ill effects," *Taylor*, 105 F. Supp. 2d at 488 (internal references omitted), conflicting expert opinions on whether harm occurred, which exist in this case in the form of debate over the levels of Ms. Farmer's viral load, CD4 count, and CD4%[38] during her time in MCAC, create "an issue of fact that courts are generally encouraged not to decide on a motion for summary judgment," *Jackson v. Fauver*, 334 F. Supp. 2d 697, 707 (D.N.J. 2004) (citing *Liberty Lobby*, 477 U.S. at 249, 255).[39]

---

[37]  The defendants claim the plaintiff has admitted that she did not always take the medications regularly, an assertion that is supported by the plaintiff's own expert, Dr. David Donovan; even if true, this would not alter the objectively serious deprivation occasioned by failure to give the plaintiff the medication used to control her HIV/AIDS regularly.  Furthermore, any role this may have played in any harm that may have resulted to Ms. Farmer would not necessarily establish that the defendants' failure to provide medication regularly could not also have contributed to the harm.

[38]  Viral load refers to the amount of HIV virus in the blood.  (*See* Ruby Letter ¶ 4c.)  CD4 is a type of white blood cell necessary to fight  disease and infection. *See* Centers for Disease Control and Prevention, http://www.cdc.gov/hiv/topics/basic/index.htm (last visited on July 18, 2007). Measurements of the levels of the virus and CD4 cells are used to determine the state of an HIV-positive person's health and how well his or her body is fighting off the disease. *See* Living with HIV/AIDS, Centers for Disease Control and Prevention, http://www.cdc.gov/hiv/pubs/brochure/livingwithhiv.htm (last visited on July 18, 2007). Ms. Farmer also alleges that her CMV retinitis worsened during her time at MCAC. CMV (cytomegalovirus) is a type of opportunistic infection, so labeled because an HIV-weakened immune system affords these infections opportunity to develop.  *See id.*  The defendants' experts dispute the conclusion that her CMV retinitis worsened while at MCAC, and Ms. Farmer's own expert does not offer an opinion on this issue.

[39]  The parties focus on the plaintiff's viral load and CD4 measurements as indicative of whether harm occurred, with the plaintiff arguing that the viral load increased which establishes that harm occurred, and the defendants arguing that no harm occurred because the load did not increase and, even if it did, no new opportunistic infections resulted. Because no new infections resulted, the defendants argue, "any deterioration" in the plaintiff's HIV-status due to an increased viral load could be reversed through regular medication, thus no damages ultimately resulted.  (Defs.' Reply Pl.'s Opp'n [hereinafter "Defs.' Reply"] at 8-9.)  Although the defendants' position suggests the contention that an increase in viral load, without more, would not constitute harm, this argument is not significantly developed.  The court notes, however, that increased presence in the body,

Dr. William Ruby, a faculty member of Johns Hopkins University School of Medicine in the Division of Infectious Diseases and HIV services, is employed as a DOC consultant for HIV services, and his opinion is relied upon by the defendants.  Dr. Ruby saw the plaintiff periodically while she was in DOC custody and prepared a summary of her health conditions during the time she was housed at MCAC.   Dr. Ruby focuses on Ms. Farmer's CD4% and HIV viral load to evaluate the progress of Ms. Farmer's disease.  (Mot. Dismiss or Summ. J., Ex. 13, Letter from Dr. William Ruby [hereinafter "Ruby Letter"] ¶ 4a.)   He maintains that Ms. Farmer's CD4% and HIV viral load remained consistent during the time she was housed at MCAC.  (*Id*. at ¶¶ 4b & 4c.)  He also states that he is "unable to confirm any opportunistic infections as defined by CDC," explaining that Ms. Farmer's eye problems are not necessarily "due to CMV retinitis".  (*Id.* at ¶ 1b.)  Dr. Ruby reports he is unable to substantiate that Ms. Farmer "suffered any significant destruction in [her] immune status as a result of the care [she] received during the period from August 22, 2002 to May 20, 2003."  (*Id*. at Summary.)

In opposition, Ms. Farmer provides the declaration of Dr. David C. Donovan who, like Dr. Ruby, reviewed Ms. Farmer's medical records.  Dr. Donovan is currently retired but has extensive medical experience, including prior appointments at Johns Hopkins University School of Medicine.  (*See* Pl.'s Opp'n, Ex. B, Dr. David Donovan Decl., Ex. 1, Curriculum Vitae.)  His review of Ms. Farmer's records from her time in MCAC led him to conclude that there was a three-week delay in starting Tenofir therapy (a daily anti-viral) and irregular delivery of other medicines prescribed for fighting the HIV virus.  (*Id.* at ¶¶ 6a-h.)  He asserts that Ms. Farmer experienced "a significant viral load increase occurring simultaneously with Plaintiff's

---

even for a limited time, of a virus that acts to destroy the body's own immune system could hardly be said to be a positive or even neutral occurrence.

imprisonment in maximum security," (*id.* at ¶ 7), and that the delay in starting Tenofir, as well as

Ms. Farmer's refusal to take medication during a twelve-day period, contributed to the spike in

her viral load, (*id.* at ¶¶ 8a, 14).  Dr. Donovan also opines that the "monumental degree of stress"

created by the conditions at MCAC contributed to this increase: a "legally blind, HIV+ inmate

with thrush and bipolar mental disease in solitary confinement 23 hours a day with one-hour

recreation while in shackles.  Nine months of such treatment produced a major depression."  (*Id.*

at ¶ 8c.)  With respect to the plaintiff's CD4%, Dr. Donovan takes issue with Dr. Ruby's

conclusion that no harm resulted just because it remained consistent during her time in MCAC,

contending that "[e]very major spike [in viral load] seems to take a little more out of Plaintiff,"

thus he would see the decline in Ms. Farmer's CD4% from 2000 to 2004 as harm potentially

caused by the spike in viral load during her stay in MCAC.  (*Id.* at ¶ 13.)  Dr. Donovan does not

offer any opinion on Ms. Farmer's CMV retinitis.  Drs. Ruby and Donovan thus present

conflicting factual accounts of the impact of Ms. Farmer's time in MCAC on the progress of her

disease.[40]

     The defendants offer another argument in their favor, however,  namely that Ms. Farmer

has not shown they were deliberately indifferent to her needs in transferring her to or continuing

her incarceration in MCAC.  Turning first to the defendants allegedly responsible for the transfer

(Kavanagh, Sacchet, Elliott, and Miller) ("transferring defendants"), Ms. Farmer contends that

they were aware that placing her in MCAC posed a risk to her serious medical needs due to a

---

[40]    In their reply briefing, the defendants offer another declaration from Dr. Daniel Wolde
Rufael, an infectious disease specialist, who asserts that the plaintiff's viral loads did not
substantially deteriorate from August 2002 to May 2003 and who speculates that any
variance in these viral loads could have been caused by Ms. Farmer's non-compliance
with her HIV medications. (Defs.' Reply, Ex. 1, Decl. Dr. Wolde Rufael, ¶ 6.)  Dr. Wolde
Rufael also affirms that Ms. Farmer did not suffer from an opportunistic infection.  (*Id.* at
¶ 5.)

memo in her base file discussing her medical and mental health problems.  This memo was sent

from a psychology associate to the warden of Maryland Correctional Training Center ("MCTC")

upon Ms. Farmer's placement in segregation in MCTC  in September 2001.  It states:

> Inmate Douglas Farmer is currently on segregation due to enemies at MCTC.  Although
> his condition does not currently warrant placement at CMHC-J [a mental health facility],
> he has both a serious medical condition and a significant mental health condition that is
> adversely affected by his continued housing on segregation.   Any assistance you can
> provide in expediting inmate Farmer's transfer is greatly appreciated.

(2d Am. Compl., Ex. A, Mem. to Warden (Sept. 17, 2001) [hereinafter "Mem. to Warden"].)  In

response, the transferring defendants swear under penalty of perjury that they were not aware of

any information, including physical or mental health problems, that would have prevented Ms.

Farmer's transfer.  (Mot. Dismiss or Summ. J., Exs. 3-6, Decls. of Leisinger, Miller, Sacchet,

and Kavanagh.)  They do not specifically deny having read this memo, but characterize the

plaintiff's argument that they did as "speculation", indicating that they do not admit to having

read it.  (Defs.' Reply at 7.)

Ms. Farmer also posits that an opinion issued by this court in 2001, *United States v.

Wallen*, 177 F. Supp. 2d 455 (D. Md. 2001), and a Department of Justice ("DOJ") report

compiled in 1996 and sent to the Governor of Maryland (Pl.'s Opp'n, Ex. K, DOJ Report (May

1, 1996) [hereinafter "DOJ Report"]) would have made the defendants aware of serious

problems with medical services at MCAC.  *Wallen* dealt with the care received by a federal pre-

trial detainee, and through the facts of that case, "the Court was exposed to a woefully

inadequate and poorly supervised system of recording the dispensing of medication." 177 F.

Supp. 2d at 458.  The court concluded that "with respect to this Defendant the Marshal's Service

cannot assure this Court that it will provide the medical care that the Constitution mandates so

long as he is held at MCAC." *Id.*  The DOJ report also raised serious concerns about the

provision of medical services at MCAC generally.  (*See* DOJ Report, § II.B.1 (cautioning that

"[a]ccess to meaningful sick call is not adequate").)

Even if the transferring defendants had read the 2001 memo (which seems like a logical

expectation of case managers and officials making transfer decisions, given its presence in the

plaintiff's base file), it would not have put them on notice that an excessive risk to Ms. Farmer's

serious medical needs would result from placing her in MCAC.  The memo, at most, would have

informed them that segregated confinement at another facility had in the past negatively affected

Ms. Farmer's mental and physical[41] health, but it would not have alerted them to a risk that

MCAC staffers would fail to provide Ms. Farmer her medication regularly, which is the omission

upon which the failure to provide medical care claim is based.[42]  A general awareness among

those in the correctional system of issues with dispensing medication at MCAC, however serious

such problems might be, would also be insufficient to establish deliberate indifference.  Even

assuming Ms. Farmer has shown that these defendants possessed a general awareness of the

problems, she has not shown that they drew from it the specific inference that transferring her to

MCAC posed a risk to her serious medical needs.  *See Rich*, 129 F.3d at 340 (having "actual

knowledge of facts from which a reasonable person might have inferred the existence of the

substantial and unique risk" to the prisoner is not enough; the prison official "must actually have

drawn the inference") (relying on the *Brennan* standard for subjective recklessness).  Defendants

---

[41]     The language of the memo is not entirely clear on this point; it speaks of Ms. Farmer
having "both" medical and mental health conditions, however, it then states that the
"significant mental health condition . . . **is** adversely affected" by segregation (bold
added), suggesting that the psychology associate who wrote it was concerned only with
the impact of segregation on Ms. Farmer's mental health, not her physical health.  (*See*
Mem. to Warden.)

[42]     To the extent that Ms. Farmer is also arguing that the conditions of segregated
confinement more generally affected her physical and mental health, these arguments
will be discussed below as a separate conditions of confinement claim.

Kavanagh, Sacchet, Elliott, and Miller are thus entitled to summary judgment on the plaintiff's failure to provide medical care claim.

Turning now to the defendants allegedly responsible for continuing Ms. Farmer's placement in MCAC (Kavanagh, Allen, Smith, and Fisher) ("confining defendants"), no additional basis for their deliberate indifference has been offered, and the arguments Ms. Farmer made with respect to the transferring defendants do not meet with any additional success when applied to them.  Furthermore, steps were taken to abate the risk posed to Ms. Farmer by the irregular provision of her medications once it was brought to the attention of responsible officials.[43]  Ms. Farmer states that the "woman who was supposed to deliver medications was on drugs all the time . . . [i]f and when she showed, if she was supposed to bring me four pills she would often only bring two, for example.  She would say she would come back with the missing pills but she wouldn't."  (Farmer Decl. ¶ 9.)  This woman was eventually fired because "there were so many complaints" about her.  (*Id.*)  Because Ms. Farmer has not shown deliberate indifference on the part of the confining defendants, and because she affirms under oath that steps were taken to fix the inadequate delivery of medications at MCAC, her claim that there was a failure to provide her with medical care during her confinement at MCAC cannot go forward.

*Conditions of Confinement*

Although Ms. Farmer's Eighth Amendment counts (counts VII and IX) speak of deliberate indifference to her serious medical needs, the facts pled and the arguments set forth in her briefing suggest that she also seeks to challenge the conditions of her confinement more generally, thus her complaint will be construed as making a separate conditions of confinement

---

[43]   It is not contended that the confining defendants were in any way responsible for dispensing medications themselves, or for supervising the woman who was responsible, or that Ms. Farmer ever addressed her concerns over her missed medications to them, thus the confining defendants are not clearly the proper defendants for these claims.

claim encompassing all conditions complained of by Ms. Farmer not related to medical care.  A claim that conditions of an inmate's confinement are tantamount to cruel and unusual punishment has both an objective and a subjective component.  *See Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993).  The two-part standard requires that a plaintiff "show both '(1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials.'" *Id.* (citing *Williams v. Griffin*, 952 F.2d 820, 824 (4th Cir. 1991)).  To aid in the objective determination of whether a serious deprivation has occurred, the Fourth Circuit requires a plaintiff to "produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions."  *Id.* at 1380-81.[44]  To satisfy the subjective requirement of acting with deliberate indifference, a prison official must "know[] of and disregard[] an excessive risk to inmate health and safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Brennan*, 511 U.S. at 837.

In order to succeed on a conditions of confinement claim, a plaintiff must identify a condition or multiple conditions of confinement with a "mutually enforcing effect" resulting in "the deprivation of a single, identifiable human need such as food, warmth, or exercise."  *Wilson v. Seiter*, 501 U.S. 294, 304- 305 (1991) (internal references omitted).  Ms. Farmer complains of a number of conditions, *inter alia*, segregated housing, severe restrictions on activities (including recreation, worship, showering, and visitation), the lack of a law library, and the lack of opportunities for prison employment or education.  These conditions could implicate many basic needs, such as exercise, however, the thrust of Ms. Farmer's argument with respect to these

---

[44]   A "condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year" may, in some circumstances, be adequate for this purpose as well.  *Helling v. McKinney*, 509 U.S. 25, 33 (1993).

conditions is that they collectively exacerbated her medical and mental health problems, not that

any one of them standing alone or any two or more in combination failed to provide for a

"single, identifiable human need".  *Id.*  "Nothing so amorphous as 'overall conditions' can rise to

the level of cruel and unusual punishment when no specific deprivation of a single human need

exists," *id.* at 305, thus to the extent that Ms. Farmer seeks to advance a conditions of

confinement claim, such a need must be identified.

Given Ms. Farmer's repeated references to the state of her mental health, she seems to be

arguing that the conditions at MCAC deprived her of her mental health or sanity.[45]  This has

been recognized as a human need, the deprivation of which can constitute an Eighth Amendment

violation.  *See Madrid v. Gomez*, 889 F. Supp. 1146, 1264 (N.D. Cal. 1995) (stating that "if the

particular conditions of segregation being challenged are such that they inflict a serious mental

illness, greatly exacerbate mental illness, or deprive inmates of their sanity, then defendants

[prison officials] have deprived inmates of a basic necessity of human existence– indeed, they

have crossed into the realm of psychological torture"); *see also Jones' El v. Berge*, 164 F. Supp.

---

[45]   In addition, she alleges that her confinement was bad for her appetite and eyesight, and
put her at risk of more opportunistic infections because she was not able to shower as
frequently.  The only one of these three areas in which she identifies any actual harm that
allegedly resulted is her eyesight, which she says deteriorated due to the lighting
conditions at MCAC.  She has not explained what those lighting conditions were, nor has
she made any allegations that any of the defendants was aware that those conditions were
bad for her eyes, thus she has not articulated the basis of an Eighth Amendment claim on
this ground.  She also alleges that solitary confinement causes stress, which is
particularly hazardous for HIV-positive people and those living with AIDS.  Regardless
of this statement's accuracy, it does not state a cognizable conditions of confinement
claim because being stress-free is an amorphous concept that does not adequately
articulate a single, identifiable human need.

2d 1096, 1117-18 (W.D. Wis. 2001) (citing *Madrid* for this proposition and explaining how

"[s]everal features of [Wisconsin's] Supermax are particularly damaging to inmates with serious

mental illnesses").  As the *Jones*' *El* court further explained:

> Most inmates have a difficult time handling these conditions of extreme social isolation
> and sensory deprivation [in a Supermax], but for seriously mentally ill inmates, the
> conditions can be devastating.  Lacking physical and social points of reference to ground
> them in reality, seriously mentally ill inmates run a high risk of breaking down and
> attempting suicide.

164 F. Supp. 2d at 1098.  It should be noted that Ms. Farmer's conditions, at least as documented

in the record before the court, have not led to the type of violence and uncontrollable behavior

exhibited by the plaintiffs discussed in *Jones*' *El*, whose incarceration in Supermax unhinged

them from any connection to the world around them. *See id.* at 1108-1115.  Ms. Farmer's profile,

however, may still place her within the definition of serious mental illness used by the *Jones*' *El*

court– taking psychotropic drugs, *id.* at 1118– because during her time at MCAC, she had

prescriptions for Wellbutrin and Celexa (Mot. Dismiss or Summ. J., Ex. 9, Psychological

Evaluation by Dr. Dunn [hereinafter "Dunn Eval."]), drugs used to treat depression (Wellbutrin)

and both depression and anxiety (Celexa), *see* http://www.wellbutrin-xl.com/ and

http://www.celexa.com/ (both last visited on July 18, 2007).

 The defendants argue that Ms. Farmer's mental health did not deteriorate during her time

at MCAC, thus she would not be able to satisfy the Fourth Circuit's requirement that serious

injury must have resulted from the challenged conditions for them to be actionable.  *See*

*Strickler*, 989 F.2d at 1379-81.  In support of this proposition, the defendants rely on materials

prepared by MCAC's chief psychologist , Dr. Stephen Dunn, who treated Ms. Farmer while she

was at MCAC.  According to Dr. Dunn, Ms. Farmer arrived at MCAC with a history of mood

disorders, including major depression and dysthymic disorder.  (Mot. Dismiss or Summ. J., Ex.

10, Summary of Encounters with Douglas Farmer [hereinafter "Dunn Summ."].)  Dr. Dunn's

initial assessment of Ms. Farmer included diagnoses of depressive disorder, antisocial disorder,

and anti-social personality disorder.  (Dunn Eval.)  Dr. Dunn affirms that during confinement at

MCAC Ms. Farmer's symptoms associated with depressive orders were observed and treated.

(Dunn Summ.)  In January 2003, her mood became "more dysphoric", and she expressed

suicidal ideation, although without the presence of a plan or intent.  (*Id.*)  An attempt was made

to adjust her medications, but she continued to report that she was experiencing psychological

distress.  (*Id.*)  Ms. Farmer's diagnosis was changed to major depression, recurrent, moderate,

and she was transferred to the Acute Mental Health Unit at Patuxent for in-patient treatment,

where she remained for two weeks.  (*Id.*)  Dr. Dunn claims that Ms. Farmer returned to MCAC

with a diagnosis of depressive disorder not otherwise specified ("NOS") after she had

experienced improvement in her level of functioning.  (*Id.*)  He states that after her return to

MCAC, Ms. Farmer's mood was described as "'euthymic with depressed undertones'" and the

range of affect was broad.  (*Id.*)  Her Axis I diagnosis at MCAC was changed from depressive

disorder NOS to dysthymic disorder to "reflect the long-term characteristics of [her] depressive

symptoms." (*Id.*)

Dr. Dunn maintains that despite the entrenched nature of her depression, she responded

to treatment and her levels of functioning remained relatively stable from March 2003 until her

transfer out of MCAC in May 2003.  (*Id.*)  He indicates that at the time of her removal from

MCAC, Ms. Farmer appeared to be "functioning at levels that were consistent with [her] mental

health history prior to placement at MCAC" and concludes that her "overall mental health did

not appear to deteriorate during [her] placement at MCAC." (*Id.*)  Ms. Farmer responds to this

conclusion by observing that although "Doctor Dunn states that my mental health did not

deteriorate while I was at Supermax, yet he prescribed sedatives and wrote the referral for me to be sent to Patuxent," (Farmer Decl. ¶ 16), measures which would suggest that being in MCAC adversely affected her health to the point that in-patient treatment was required.  Dr. Donovan also attributes Ms. Farmer's "major depression" to her time at MCAC.  (*See* Donovan Decl. ¶ 8c.)  The conflict over the existence of an injury does not need to be further addressed, however, because the defendants are entitled to summary judgment on other grounds.[46]

Ms. Farmer has not shown that the defendants' actions constituted deliberate indifference.  With respect to the transferring defendants, the 2001 memo, even if they had read it, would have informed them only that Ms. Farmer had a "significant mental health condition" that had been negatively affected by segregation.  As the memo stated this impact was not sufficiently serious to warrant her immediate removal from segregation and placement in a mental hospital, it would not, in and of itself, establish the defendants' awareness that transferring Ms. Farmer once again to segregated housing would rob her of her mental health or sanity, only that it was not an ideal placement for her and could have harmful consequences.[47]

---

[46]  There is thus also no need for consideration of whether Ms. Farmer has satisfied the physical injury requirement of 42 U.S.C. § 1997e(e), which is coextensive with the Eighth Amendment physical injury test, for recovering monetary damages for mental or emotional injury.  *See*, *e.g.*, *Harper v. Showers*, 174 F.3d 716, 719 (5th Cir. 1999) (applying § 1997e(e) to bar psychological damages absent allegation of more than *de minimis* injury). .

[47]  Although Ms. Farmer did not direct the court's attention to this document, the court notes that a transfer document prepared by someone at RCI on August 22, 2002 clearly lists "major depression", "bipolar", and "anxiety" as "medical problems/alerts" for Ms. Farmer.  (*See* Donovan Decl., Ex. 2.)  The preparer's signature is not legible, but it does not appear to be one of the transferring defendants, nor does anything in the document suggest that it was presented to any of these defendants for review.  This document does support the logical expectation, however, that someone within a prison would be in possession of the relevant information about an inmate's physical and mental health status, especially when that inmate was being considered for transfer.

Ms. Farmer further claims it is well accepted that prolonged incarceration under conditions at a Supermax facility may cause severe psychological repercussions and result in the "SHU [Segregated Housing Unit] Syndrome". This syndrome "is not an officially recognized diagnostic category, [but] it is made up of official diagnoses such as paranoid delusional disorder, dissociative disorder, schizophrenia and panic disorder" experienced by prisoners as a result of the "extremely isolating conditions in supermaximum confinement." *Jones' El*, 164 F. Supp. 2d at 1101-02. As the DOJ report on MCAC reminded Maryland's then Governor, "[c]onditions that inflict serious mental pain or injury also implicate the Eighth Amendment," just as those that inflict serious physical pain or injury do. (DOJ Report, § I.A.) At the time the report was written in 1996, the DOJ found that measures to provide for prisoners' mental health problems– which are likely to be created or exacerbated by being in MCAC– were not adequate; indeed, "systemic deficiencies render[ed] Supermax's mental health care system incapable of satisfying minimum constitutional standards." (*Id.* at § II.B.2.)

MCAC currently has in place a system designed to address inmates' mental health needs, beginning with mental health screening before or immediately following transfer there and continuing with regular sessions with a psychologist. (*See* DCD 100-161, §§ III.B.2 and III.C.4 (requiring psychological screening of proposed transferees prior to non-emergency transfers and within twenty-four hours of transfer for emergency transfers) and DCD 100-160, §§ III.F and III.J (establishing regular sessions with a psychologist for all MCAC inmates).) Inmates suffering from serious mental illness are not supposed to be transferred to MCAC absent specific approval. (*Id.* at § III.F (providing that "[n]o inmate who is suffering from current active severe and/or persistent mental illness[48] shall be assigned to housing at the Maryland

---

[48]    "Severe and/or persistent mental illness includes but is not limited to psychosis or thought disorders; major depressive episodes with assessment of high suicide risk;

Correctional Adjustment Center unless approved by the Director of Mental Health and the Commissioner").)

These policies, which would presumably be known to all the defendants as DOC employees, suggest a general awareness within the Maryland correctional community of the potential for serious adverse consequences resulting from incarcerating mentally ill inmates in MCAC.  It is possible this awareness, coupled with any degree of knowledge of Ms. Farmer's mental health issues (which the transferring defendants, perhaps disingenuously, deny having), could have, and perhaps should have, led the transferring defendants to infer that Ms. Farmer's mental health would be at serious risk at MCAC.   MCAC is known to have more austere conditions than other segregated housing situations and, as a matter of DOC policy, not generally considered appropriate for inmates with serious mental illness, thus she could be expected to have an even more negative reaction to confinement there than she did to her previous segregated confinement.

The possibility this inference could have been reached, or even the conclusion it should have been reached, however, does not provide evidence of deliberate indifference.  Ms. Farmer has not offered any proof that the transferring defendants made this inference and were aware of the risk her transfer posed.[49]  *See Scarver v. Litscher*, 434 F.3d 972, 975 (7th Cir. 2006)

---

bipolar disorder with active symptoms; and personality disorders with serious and persistent self-injurious behaviors." (DCD-100-160, § III.F.)  As discussed above, the precise nature of all of Ms. Farmer's psychiatric issues is not entirely clear, however, given that this list is not all-inclusive and that she has a lengthy history of serious mental health problems, she could well come within this definition.

[49]   In her initial complaint, Ms. Farmer states that she never had a pre-transfer psychological screening, which presumably would have revealed her mental health issues and forced the transferring defendants to confront them.  In contrast, another inmate implicated in the alleged identity theft scheme did receive a screening before being sent to MCAC.  *See Bush*, 2004 WL 5040000 at *1.  There are many possible reasons why Ms. Farmer did not receive a screening, even though another inmate being moved pursuant to the same

(explaining that although defendant officials "[p]robably . . . should have known" that transferring a mentally ill inmate to a Supermax facility would have put him "at risk of severe distress", "that would make them guilty merely of negligence and not of deliberate indifference (the mental state required to establish an Eighth Amendment violation), which would require proof that they were conscious of the risk") (citing, *inter alia*, *Brennan*, 511 U.S. at 837-38).

Nor do the 2001 memo and general knowledge of the mental health issues engendered by placement at MCAC establish deliberate indifference on the part of the confining defendants in this case. As her mental health problems manifested themselves during her incarceration at MCAC, the problems were responded to, in the form of meetings with psychologists, medication, and placement in a mental hospital at one point, suggesting that MCAC officials did not disregard whatever risk the conditions of confinement posed to her mental health or sanity.[50] *Compare Madrid*, 889 F. Supp. at 1266-67 (concluding that the defendants were deliberately indifferent when they did not act to "ameliorate the offending conditions with respect to these [mentally ill or otherwise vulnerable] inmates, or otherwise seriously address the issue"). It is true that the confining defendants did not act to change the essential structure of the confinement (deprivation of human contact, restricted movement, and so on), but in providing mental health treatment, they helped give her tools intended to cope with it. They may not have provided mental health care precisely as called for by the DOC– for instance, Ms. Farmer states that she was not seen by a psychologist within twenty-four hours of her arrival in

---

investigation did, thus Ms. Farmer's lack of a screening does not establish anything about the transferring defendants' state of mind, although it may well reflect a lack of due care on their part.

[50] As noted with respect to the failure to provide medical care claim brought against the confining defendants, their degree of responsibility for Ms. Farmer's specific treatment while she was in MCAC is not clear.

MCAC, as specified by DCD 100-161, § III.C.4– but they took steps to make sure Ms. Farmer's mental stability and sanity were preserved.  While these steps may not have been the ones she would have chosen, and may not constitute a meaningful response in the situation of every mentally ill inmate experiencing distress in Supermax confinement, in this case, they show that the defendants did not have "a callous lack of concern" for Ms. Farmer's mental health, *Madrid*, 889 F. Supp. at 1267.  Thus, the defendants are entitled to summary judgment because they have not been shown to have acted with deliberate indifference.

This is not to say that placement of a seriously mentally ill person in MCAC, if it resulted in serious injury and was done with deliberate indifference, would not violate the Eighth Amendment, or that it showed good judgment to subject an apparently non-violent prisoner, suffering from mental and physical health issues, to MCAC's onerous conditions. Incarcerating mentally ill inmates in a Supermax-type facility can be "the mental equivalent of putting an asthmatic in a place with little air to breathe," *id.* at 1265; unless those responsible for the placement are found to have acted with deliberate indifference, however, their actions may be imprudent or even reprehensible but not unconstitutional.  *See generally Brennan*, 511 U.S. at 837 (explaining that "[t]he Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'")

*Qualified Immunity*

Because the defendants are entitled to summary judgment on all the Eighth Amendment claims on the ground that Ms. Farmer has not demonstrated that they acted with deliberate indifference, their arguments for qualified immunity do not need to be addressed.  *See Scarver*, 434 F.3d at 973 (explaining that because the plaintiff's conditions of confinement claim failed on the merits due to lack of deliberate indifference on the defendants' part, the appellate court

"did not have to consider immunity", which had been relied on by the district court in granting summary judgment to the defendants).

**State Constitutional Claims**

Ms. Farmer also brings her claims under the relevant parts of the state constitution (counts II, IV, VI, VIII, X): Article 24 (right to due process) and Articles 16 and 25 (right to freedom from cruel and unusual punishment) of the Maryland Declaration of Rights.  These provisions have been "consistently construed . . . as being *in pari materia* with their Federal counterparts."  *Evans*, 914 A.2d at 67.  The same analysis thus applies to the state constitutional claims as the federal ones, with the exception of the qualified immunity analysis applied to the Fourteenth Amendment claims.  Maryland law does not provide immunity to state officials charged with violating the state constitution.  *See Ashton v. Brown*, 660 A.2d 447, 464-65, 339 Md. 70, 105 (1995); *see also Franklin v. Clark*, 454 F. Supp. 2d 356, 363 (D. Md. 2006) (explaining that "a public official who violates a plaintiff's Maryland constitutional rights may be personally liable for compensatory damages . . . qualified immunity is not available as a defense") (internal citation omitted).

When "the federal basis for an action drops away," as has happened in Ms. Farmer's case, "federal courts generally have discretion to retain *or* dismiss state law claims."  *Shanaghan v. Cahill*, 58 F.3d 106, 109 (4th Cir. 1995).  A district court's "wide latitude" in making this decision may be informed by many factors, including the principle of comity.  *See id.* at 110. Ms. Farmer's remaining claim concerns the due process protection afforded to her by Article 24 of the Maryland Articles of Declaration.  This court is not inclined to impose liability on this state constitutional claim in the absence of any remaining federal question, and in light of the state court's decision in *Patrick*, 847 A.2d at 457-61.  Ms. Farmer's Article 24 claim thus will be

dismissed,[51] and judgment will be entered in favor of the defendants on the claims brought under

Articles 16 and 25 because those were not decided on qualified immunity grounds.

A separate order follows.

Date:   July 19, 2007                           _____/s/_____
                                                        Catherine C. Blake
                                                        United States District Judge

---

[51] Dismissal does not leave Ms. Farmer without a means of pursuing this claim.  If she chooses, she may file it in the appropriate state circuit court within thirty days of the entry of this court's order of dismissal without it being time-barred, provided it was initially filed within the applicable period of limitations set forth by Maryland law.  Md. Rule 2-101(b)(2).